NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ARTURO VALLES, Individually, and as Guardian ad Litem for SYLVIA VALLES, his wife, and SYLVIA BUDINICH<br><br>Plaintiffs,<br><br>v.<br><br>TOWNSHIP OF PARSIPPANY-TROY HILLS, TOWNSHIP OF PARSIPPANY-TROY HILLS POLICE DEPARTMENT, CHIEF OF POLICE MICHAEL FILLIPPO, LIEUTENANT EDWARD JASIECKI, OFFICER ALAN REMBOLD, OFFICER DANIEL MCCONNELL, TOWNSHIP OF PARSIPPANY-TROY HILLS FIRST AID SQUAD, GRACE MURRAY, SAINT CLARE'S HOSPITAL, SAINT CLARE'S HOSPITAL MOBILE INTENSIVE CARE UNIT, JOHN DOE(S) 1-25, and ABC ENTITIES/AGENCIES 1-25<br><br>Defendants. | Civil Action No. 07-1539 (JAG)<br><br>OPINION |

**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on the motion of defendants, Township of Parsippany-Troy Hills, Township of Parsippany-Troy Hills Police Department, Chief of Police Michael Fillippo, and Lieutenant Edward Jasiecki ("Lt. Jasiecki"), (collectively "Defendants"),

1

for summary judgment, pursuant to FED. R. CIV. P. 56, against plaintiffs Arturo Valles, ("Mr. Valles"), Sylvia Valles, ( "Mrs. Valles"), and Sylvia Budinich, ("Mrs. Budinich"), (collectively, "Plaintiffs"). For the reasons set forth below, Defendants' motion is granted in part, and denied in part.

## I. FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted. On June 6, 2005, Mrs. Valles returned to her family home in Parsippany, New Jersey following dinner out with her daughter, Mrs. Budinich. (Plaintiff's Reply to Defendants' Statement of Material Facts, ("Pl. Reply"), ¶ 3.) Mrs. Valles informed her husband, Mr. Valles, that she was not feeling well and, thereafter, retired upstairs. (Id., ¶ 4.) A short time later, Mr. Valles heard a loud bang from upstairs. (Id.) Mr. Valles rushed upstairs to determine the source of the noise, and found his wife lying on the bedroom floor in an unresponsive state. (Id., ¶ 5.)

A few minutes after he discovered his wife, Mr. Valles called 9-1-1 (the "Valles 9-1-1 call"). (Id., ¶ 7.) The call was answered by Lt. Jasiecki, and lasted five minutes and twenty-one seconds. (Id., ¶¶ 9,10.) The Mobile Intensive Care Unit (MICU) was dispatched three minutes and forty-two seconds into the Valles 9-1-1 call.

At some point during the 9-1-1 call, Lt. Jasiecki inquired of Mrs. Valles' breathing ability. (Defendants' Statement of Material Facts ("Def. 56.1 Stmt."), ¶ 14; Pl. Reply, ¶ 14.) In response to Lt. Jasiecki's questioning, Mr. Valles told Lt. Jasiecki that his wife was unconscious, and that he did not know whether or not she was breathing.[1] (Def. 56.1 Stmt., ¶ 15; Pl. Reply, ¶

---

[1] Mr. Valles was admittedly upset. (Def. 56.1 Stmt., ¶ 17; Pl. Reply, ¶ 17.) During their conversation, Lt. Jasiecki advised Mr. Valles to remain calm.

2

15.)

Approximately five minutes after the start of the Valles 9-1-1 call, Parsippany-Troy Hills Patrolman Alan Rembold ("Patrolman Rembold") arrived at the Valles home. (Def. 56.1 Stmt., ¶ 28; Pl. Reply, ¶ 28.) Patrolman Rembold examined Mrs. Valles, but could not detect vital signs. (Def. 56.1 Stmt., ¶ 29; Pl. Reply, ¶ 29.) Patrolman Rembold also observed that Mrs. Valles' skin was a "blueish like purpleish" tone, which, to him, indicated a lack of oxygen. (Def. 56.1 Stmt., ¶ 30; Pl. Reply, ¶ 30.) Defendants contend that Patrolman Rembold observed that Mrs. Valles was not breathing, and that there was no chest rise to indicate that she was receiving oxygen. (Def. 56.1 Stmt., ¶ 31.) Patrolman Rembold then administered several chest compressions, two shocks, and oxygen to Mrs. Valles. (Def. 56.1 Stmt., ¶ 33; Pl. Reply, ¶ 33.)

After administering oxygen, Patrolman Rembold repositioned Mrs. Valles' head "because he felt that the oxygen did not go down properly." (Def. 56.1 Stmt., ¶ 34; Pl. Reply, ¶ 34.) The parties dispute whether Patrolman Rembold cleared Mrs. Valles' airway of anything causing resistance, and whether Patrolman Rembold observed chest rise after repositioning Mrs. Valles' head. (Def. 56.1 Stmt., ¶ 35; Pl. Reply, ¶ 35.)

At this point, Parsippany-Troy Hills Police Officer Daniel McConnell ("Officer McConnell") arrived at the Valles' home and began assisting Patrolman Rembold. (Def. 56.1 Stmt., ¶ 36; Pl. Reply, ¶ 36.) Defendants contend that Officer McConnell testified that he also experienced resistance, when he attempted to administer oxygen to Mrs. Valles. (Def. 56.1 Stmt., ¶ 38.) Grace Murray ("Ms. Murray") and David Schwind, both MICU officers, arrived as

3

the officers were administering CPR.[2]  (Def. 56.1 Stmt., ¶¶ 40, 41; Pl. Reply, ¶¶ 40, 41.)

Upon arrival, Ms. Murray requested that Patrolman Rembold and Officer McConnell cease CPR efforts so that she could intubate Mrs. Valles.  (Def. 56.1 Stmt., ¶ 42; Pl. Reply, ¶ 42.)  According to Defendants, Ms. Murray was unable to insert an endotracheal tube down Mrs. Valles' throat, because a large piece of meat was lodged in her airway, near the location of the Adam's apple.  ((Def. 56.1 Stmt., ¶¶ 45, 48; Pl. Reply, ¶¶ 45, 48.)  The parties dispute whether the meat could have been removed from Mrs. Valles' throat without the use of MICU's equipment.  (Def. 56.1 Stmt., ¶¶ 46, 49; Pl. Reply, ¶¶ 46, 49.)

After the meat was removed, and Plaintiff was successfully intubated, she was transferred to the Morristown Memorial Hospital Emergency Room.  (Def. 56.1 Stmt., ¶ 51; Pl. Reply, ¶ 51.)  At the hospital, Mrs. Valles was found to have an anterior wall myocardial infarction.[3]  (Def. 56.1 Stmt., ¶ 58; Pl. Reply, ¶ 58.)  Mrs. Valles underwent successful surgery to remedy that problem.  (Def. 56.1 Stmt., ¶ 59; Pl. Reply, ¶ 59.)  Mrs. Valles remained unresponsive and was eventually transferred to the Willow Creek Rehabilitation and Care Center, where she has shown little improvement.  (Def. 56.1 Stmt., ¶ 60; Pl. Reply, ¶ 60.)

Defendants submitted an expert report authored by Dr. Hillel Ben-Asher ("Dr. Ben-Asher"), who testified that Mrs. Valles' myocardial infarction began during her dinner and

---

[2] CPR is the "abbreviation for cardiopulmonary resuscitation" which is defined as " a basic emergency procedure for life support, consisting of artificial respiration and manual external cardiac massage.  It is used in cases of cardiac arrest to establish effective circulation and ventilation in order to prevent irreversible cerebral damage from anoxia."  MOSBY'S MEDICAL, NURSING AND ALLIED HEALTH DICTIONARY 443, 293(6th ed. 2002).

[3] A myocardial infarction is the "necrosis of a portion of cardiac muscle caused by an obstruction in a coronary artery through either atherosclerosis, a thrombus or a spasm [and is] [a]lso called [a] heart attack."  MOSBY'S, supra note 2, at 1143.

continued when she returned to her home. (Def. 56.1 Stmt., ¶ 65.) Dr. Ben-Asher opined that Mrs. Valles subsequently regurgitated a piece of meat, which became lodged in her throat, rendering CPR useless to treat her respiratory arrest. (Def. 56.1 Stmt., ¶ 66.)

Plaintiffs allege that Lt. Jasiecki's negligent failure to use dispatch cards correctly resulted in the injury to Mrs. Valles. (See Def. 56.1 Stmt., ¶ 61; Pl. Reply, ¶ 61.) These dispatch cards are a set of guidecards, used by 9-1-1 dispatchers to assist callers with their emergency. (Def. 56.1 Stmt., ¶ 13.)[4] Plaintiffs submitted the report of David Johnson, an independent forensic consultant, former police lieutenant, and certified paramedic, in support of their argument that Lt. Jasiecki's failure to follow the guidecards caused Mrs. Valles' injuries. (Pl. Reply, ¶ 67.)

## II.  PROCEDURAL POSTURE

On March 13, 2007, Plaintiffs filed a Complaint in the Superior Court of New Jersey, Law Division, Morris County, asserting negligence claims, substantive due process claims, and loss of services claims against Defendants. Defendants filed a Notice of Removal with this Court on April 2, 2007. Jurisdiction is proper with this Court under 28 U.S.C. § 1441, as issues in the instant action arise under federal law.

Defendants answered Plaintiffs' Complaint, and discovery was conducted. Thereafter, Defendants moved for summary judgment on all of Plaintiffs' claims. On March 11, 2009, this

---

[4] (See also Transcript of 3/11/2009 Oral Argument, ("3/11 Tr."), at 5:24-6:3 ("The cards are a set on a Roll-A-Dex where [the dispatcher is] trained to specifically go to the specific card and ask the initial questions that are set forth in the card. And it's literally like a - - - it's a diagnosis. It's almost like following Map Quest.").)

Court heard oral argument on Defendants' summary judgment motion.[5]  This Court reserved ruling on Defendants' motion, and considers the parties' arguments here.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate under FED. R. CIV. P. 56©, when the moving party demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Cascara v. Pomeroy, 313 F.3d 828, 832-33 (3d Cir. 2002).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and is material if, under the substantive law, it would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Justofin v. Metro. Life Ins. Co., 372 F.3d 517, 521 (3d Cir. 2004).  This Court views "the facts in the light most favorable to the nonmoving party and draw[s] all inferences in that party's favor." Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007) (internal citation omitted).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence."  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

When the moving party has the burden of proof on an issue at trial, that party has "the burden of supporting their motions 'with credible evidence . . . that would entitle [them] to a directed verdict if not controverted at trial.'"  In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting Celotex, 477 U.S. at 331); see also United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) ("When the *moving* party has the burden of proof at trial, that party

---

[5] At oral argument, Plaintiffs agreed that the only remaining Defendants were the Township of Parsippany-Troy Hills, Township of Parsippany-Troy Hills Police Department, Chief of Police Michael Fillippo, and Lt. Jasiecki.  (See 3/11/09 Tr., at 2:7-3:22.)

must show affirmatively the absence of a genuine issue of material fact: it . . . must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." (emphasis in original) (internal citations omitted)). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985). The non-movant cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

## IV. DISCUSSION

### A. Statutory Immunity

Defendants raise the novel argument that Plaintiffs' common law negligence claims against Lt. Jasiecki must fail, because he is entitled to limited immunity against such claims, pursuant to N.J. Stat. Ann. § 52:17C-10(d). In relevant part, the statute provides:

> No telephone company, person providing commercial mobile radio service as

> defined in 47 U.S.C. § 332(d), public safety answering point, or manufacturer supplying equipment to a telephone company, wireless telephone company, or PSAP, or any employee, director, officer, or agent of any such entity, shall be liable to any person for civil damages, or subject to criminal prosecution resulting from or caused by any act, failure or omission in the development, design, installation, operation, maintenance, performance or provisioning of any hardware, software, or any other aspect of delivering enhanced 9-1-1 service, wireless 9-1-1 service or wireless enhanced 9-1-1 service. This limitation of liability is inapplicable if such failure resulted from a malicious purpose or a wanton and willful disregard for the safety of persons or property.

N.J. Stat. Ann. § 52:17C-10(d)

Defendants argue that the Parsippany-Troy Hills Police Department is a public safety answering point (PSAP), and thus, pursuant to N.J. Stat. Ann. § 52:17C-10(d), Lt. Jasiecki, as an employee of the PSAP, enjoys immunity from suits stemming from his performance or handling of emergency calls. In contrast to Defendants' creative interpretation of N.J. Stat. Ann. § 52:17C-10(d), however, the plain language of the statute is clear that immunity is afforded only in situations where there is a technical failure of 9-1-1 call services; for example, the failure of a 9-1-1 call to connect because of a service provider's faulty hardware.

Notably, Defendants fail to cite any court that has concluded that N.J. Stat. Ann. § 52:17C-10(d) shields emergency service providers from suits alleging negligent handling of 9-1-1 calls. At the summary judgment stage, this Court is not persuaded by Defendants' argument. Lt. Jasiecki is not entitled to immunity against Plaintiffs' common law negligence claims, pursuant to N.J. Stat. Ann. § 52:17C-10(d).

**B.     Proximate Cause**

Defendants alternatively proffer the argument that Lt. Jasiecki's actions were not the

proximate cause of Mrs. Valles' injury.[6] The parties discuss, at length, the question of whether sufficient oxygen supply would have been restored to Mrs. Valles if Mr. Valles, instructed by Lt. Jasiecki, had performed the head-tilt chin-lift movement. Plaintiffs spend a significant amount of time asserting that Mrs. Valles' breathing was restored after the officers performed the head-tilt chin lift movement. Defendants spend an equal amount of time arguing the opposite proposition and chiding Plaintiffs for not producing expert medical testimony in support of their argument. Defendants contend that there is no evidence indicating that Lt. Jasiecki's actions proximately caused Mrs. Valles' injuries. Specifically, Defendants contend that,

> Plaintiff's respiratory arrest was complicated by an unseen piece of meat lodged in her throat and no matter what the police officers did prior to the arrival of the MICU members (who were only able to open Plaintiff's airway with forceps and a laryngoscope) nothing could have been done to restore her breathing and assist her. There is no evidence to suggest that the CPR efforts made by the officers prior to the removal of the obstruction were successful in getting oxygen to Plaintiff.

(Def. Moving Br., at p. 6.)

In support of that argument, Defendants rely on Craparotta v. Froriep, 2007 WL 845896 (N.J. Super. Ct. App. Div. Mar. 22, 2007). In Craparotta, the Appellate Division affirmed the trial court's grant of summary judgment to defendant police officers, where the plaintiffs' expert failed to "explain what the responding police officers could have done differently or how any of the responding police officers deviated from any standard of care. Moreover, he did not definitively attribute any deviation as a proximate cause of decedent's death." 2007 WL 845896,

---

[6] To establish negligence under New Jersey law, a plaintiff must establish that 1) the defendant owed plaintiff a duty of reasonable care; 2) the defendant breached that duty; 3) that the breach constituted a proximate cause [of the injury]; and 4) that plaintiff was injured. Keith v. Truck Stops Corp. of Am., 909 F.2d 743, 745 (3d Cir. 1990).

at *1.

While Craparotta appears to be factually similar to the instant action, in this action there is a subtle, yet important additional detail that creates a genuine issue as to a material fact. In Craparotta, the plaintiffs' expert put forth no evidence that the responding police officers' action or inaction caused the decedent's death. Here, however, Plaintiffs' expert has put forth evidence that Lt. Jasiecki's failure to follow the guidecards proximately caused Mrs. Valles' injuries. Specifically, in his expert report, Johnson states that Lt. Jasiecki should have eventually proceeded to a guidecard entitled, "Choking Adult Instructions," and given Mr. Valles further instructions, pursuant to that card. (Ex. M, attached to Moore Cert.) The Choking Adult Instructions Guidecard instructs individuals dealing with potential choking situations.[7] Specifically, in situations where a victim appears to be unconscious, an individual is to administer thrust movements to the abdomen. This movement, this Court presumes, is what is commonly known as the Heimlich Maneuver. Once completed, the individual is to lift the chin, open the victim's mouth, and sweep out the impeding object.[8]

In this case there is no dispute that Mrs. Valles' oxygen supply was restricted by a piece of meat lodged in her throat. There is however, a genuine issue as to a material fact regarding whether the lodged meat restricting Mrs. Valles' breathing could have been removed prior to the arrival of MICU staff. (See Pl. Response, ¶ 66.) Defendants vigorously contend that the meat could not have been removed without the assistance of a laryngoscope and Magill forceps,

---

[7] The Chocking Adult Instructions Guidecard apparently follows the Adult CPR Instructions Guidecard, where assistance given pursuant to the CPR Guidecard is futile.

[8] Plaintiffs also advanced this argument at oral argument. (See 3/11 Tr., at 9:20-10:20.)

medical devices used on Mrs. Valles by MICU nurses. Defendants' conclusion, gleaned from the testimony of the attending nurse, is flawed. Ms. Murray testified only that she was unable to visualize the meat without the assistance of the laryngoscope, and upon locating the meat, she had to remove it with Magill forceps because the meat was out of finger-sweep range. (Moore Cert. Ex. I, at 75:10-76:15; 78:23-79:30.)[9]

The fact that the piece of meat was not visible to the naked eye does not mean that it could not have *become* visible and regurgitated or removed through a finger-sweep, if Mr. Valles had been given the Choking Adult Instructions, and had performed abdominal thrusts on Mrs. Valles. Thus, this Court finds that there is a genuine issue as to a material fact, regarding whether Lt. Jasiecki's failure to administer proper instructions proximately caused the injury to Mrs. Valles.

C.     **Plaintiffs' § 1983 Claims**

Plaintffs also assert claims against Defendants, pursuant to the Fourteenth Amendment to

---

[9] During her deposition, Ms. Murray was asked, "Is it something you could have opened the airway without the piece of equipment you had?" Ms. Murray replied, "No." (Exhibit I, attached to Moore Cert., at 75:24-76:3.) Defendants contend that this testimony makes "clear that the detection of the piece of meat and its extraction would have been impossible without the advanced equipment carried [sic] the MICU. (Def. Moving Br., p. 15.) This Court disagrees with Defendants' interpretation of the deposition transcript and with Defendants' deductive reasoning. The stated question was not grammatically correct, and as a result, invited an ambiguous response. Moreover, the transcript continues with Ms. Murray saying, "Not and visualized it, no." (Exhibit I, attached to Moore Cert., at 76:5.) Presumably, Ms. Murray thought she was answering questions about whether she was able to visualize the lodged meat without special equipment, and not offering a medical opinion as to by what means the meat could be dislodged. There is, thus, a genuine issue as to a material fact whether the meat lodged in Mrs. Valles throat could have been removed prior to the arrival of the MICU.

11

the Constitution of the United States and 42 U.S.C. § 1983.[10]  Specifically, Plaintiffs allege that Lt. Jasiecki's negligent handling of the Valles 9-1-1 call constitutes a violation of substantive due process rights.

The Fourteenth Amendment does not place an affirmative obligation on the state or a state actor to provide rescue services, nor does it require that such services, where provided, be carried out in competent fashion.  <u>Brown v. Commonwealth of Pennsylvania Dep't of Health Emergency Med. Servs.</u>, 318 F.3d 473, 478 (3d Cir. 2003) (finding no constitutional violation, and thus, no liability under Section 1983 where plaintiff alleged that emergency medical services providers "failed to exercise the well-established and universally recognized protocols for choking situations...[and where] neither [defendant] attempted to reach down and directly remove the grape from [the decedent's] throat.").[11]

---

[10] Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

"By its own terms, the statute does not create substantive rights.  Instead, it only provides remedies for deprivations of rights established elsewhere in the Constitution or federal laws." <u>Brown v. Commonwealth of Pennsylvania Dep't of Health Emergency Med. Servs.</u>, 318 F.3d 473, 477 (3d Cir. 2003).  Thus, in the instant action, Plaintiffs' § 1983 claim alleges deprivation of substantive due process rights, in violation of the Fourteenth Amendment to the Constitution of the United States.

[11] This Court notes Plaintiffs' allegations are strikingly similar to the allegations made in <u>Brown</u>.

There are two discrete exceptions to the general rule of non-liability: the "special relationship" exception[12], and the "state-created danger" exception. Id. (citing DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 201 (1989)). Under the state-created danger exception, "the state may be liable for constitutionally protected rights, even in the absence of a special relationship with an individual, when the state, through its affirmative conduct, creates or enhances a danger for the individual. Id.

In the Third Circuit, to state a claim under the state-created danger theory, a plaintiff must establish all of the following:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that "the plaintiff was a foreseeable victim of the defendant's acts" or a "member of a discrete class of person subject to the potential harm brought about by the state's actions," as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006) (internal citations omitted).

State-created danger cases often turn on the second prong, the culpability standard, because it is typically the most difficult element for a plaintiff to prove. Sanford v. Stiles, 456 F.3d 298, 305 (3d Cir. 2006). In Sanford, the Third Circuit reiterated "that in any state-created danger case, the state actor's behavior must *always* shock the conscience," but clarified that

---

[12] Neither Plaintiffs nor Defendants contend that the special relationship exception applies here. This Court agrees. See Brown, 318 F.3d at 478 ("The special relationship exception is implicated when the state restrains an individual so as to expose the individual [to] harm.").

"what is required to meet the conscience-shocking level will depend upon the circumstances of each case, particularly the extent to which deliberation is possible." Id. at 310.  Specifically, "[t]he level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases." Id. at 309.  In a "hyperpressurized environment," typically an intent to cause harm is required. Id.  In contrast, if a state actor has time to deliberate and make "unhurried judgments," he or she must have acted with "deliberate indifference."  Finally, where a state actor is not faced with a "hyperpressurized environment," but nevertheless cannot delay acting,[13] the actor must have "consciously disregarded a great risk of harm." Id. at 309-10.

This Court finds Lt. Jasiecki acted in a hyperpressurized environment, in responding to the Valles 9-1-1 call.  Compare Sanders v. Philadelphia, 513 F. Supp. 2d 439, 447 (E.D. Pa. 2007) (finding a hyperpressurized environment where defendant police officers decided to take a gunshot victim to the hospital instead of waiting for an ambulance) with Ziccardi v. Philadelphia, 288 F.3d 57 (3d Cir. 2002) (employing the moderate conscious disregard standard where, after several minutes of questioning the apparently intoxicated plaintiff and demanding that he stand up, defendant paramedics vigorously hoisted plaintiff over their shoulders, further injuring plaintiff's neck and rendering plaintiff paralyzed.).

In this case, Lt. Jasiecki received an emergency call for medical assistance that required him to give immediate response and assistance to a lay person, who was admittedly "upset." There is no allegation that Lt. Jasiecki or any other Defendant acted with an intent to cause harm.

---

[13] "Generally, this category will include situations in which the state actor is required to act 'in a matter of hours or minutes.'" Sanford, 456 F.3d at 310.

14

Defendants are entitled to summary judgment on Plaintiffs' substantive due process claims.[14]

**D.     Loss of Services**

Generally, a spouse "is entitled to fair and reasonable compensation for any loss or impairment of [his partner's] services, society or consortium because of injuries sustained . . . as a proximate result of defendant's wrongdoing." Thalman v. Owens-Corning Fiberglass Corp., 676 A.2d 611, 614 (N.J. Super. Ct. App. Div. 1996) (internal quotation omitted).

This Court finds that Plaintiffs have failed to produce any evidence to support a separate claim for loss of services.[15] In their reply, Plaintiffs provide this Court with evidence of the pecuniary loss suffered by Mrs. Valles as a result of her injury, and with the monthly cost of Mrs. Valles' care. Plaintiffs may be entitled to damage amounts equal to the aforementioned losses and costs, if they are successful on the negligence claims. Plaintiffs may not cite these figures as

---

[14] This Court does not address the remaining prongs of the state-created danger test, as Plaintiffs have failed to carry the requisite burden as to the second prong. See Bilbili v. Klein, 249 F. App'x 284, 288 (3d Cir. 2007). There is also no need to examine Plaintiffs' § 1983 claim against municipal Defendants Township of Parsippany-Troy Hills, Township of Parsippany-Troy Hills Police Department, and Chief of Police Michael Fillippo. See, e .g., Hill v. Borough of Kutztown, 455 F.3d 225, 245 (3d Cir. 2006) (holding "[t]here cannot be an award of damages against a municipal corporation based on the actions of one of its officers when in fact ... the officer inflicted no constitutional harm."). Moreover, Plaintiffs concede that § 1983 liability cannot be imputed to the municipal Defendants. (Plaintiffs' Brief in Opposition to the Motion for Summary Judgment at p. 42.)

[15] This Court shall not consider Defendants' late-raised argument that Plaintiff Budinich, Mrs. Valles' adult daughter is, as a matter of law, barred from asserting a loss of services claim. Nor does this Court agree with Defendants' assertion that "expert testimony is necessary to avoid leaving the jury to conjecture on valuation." (Defendants' Moving Brief in Support of the Motion for Summary Judgment at p. 31.) Rather, "[e]xpert testimony is not necessary to place a value on prospective services, but it is helpful to avoid leaving the jury to conjecture on those values." Brown v. Kennedy Mem'l Hosp., 711 A.2d 1370, 1377 (N.J. Super. Ct. App. Div. 1998) (analyzing New Jersey's wrongful death statute). Based on this Court's ruling, resolution of these issues is superfluous.

evidence for a loss of services claim, however, because neither figure represents the loss of a spouse's services, society, companionship and comfort.  See Hauck v. Denclar, 620 A.2d 479, 480 (N.J. Super. Ct. Law Div. 1993).[16]

Plaintiffs do not produce any additional evidence as to what damage Mr. Valles has suffered or will suffer as a result of the loss to him of Mrs. Valles' services or companionship. Defendants are entitled to summary judgment on Plaintiffs' loss of services claim.

## V.  CONCLUSION

For the reasons stated above, the motion of Defendants for summary judgment, pursuant to FED. R. CIV. P. 56, is denied, as to Plaintiffs' common law negligence claims against Lt. Jasiecki; and it is granted as to 1) Plaintiffs' § 1983 claims against all Defendants; 2) and Plaintiffs' loss of services claims against all Defendants.

Date: June 29, 2009

                                            S/Joseph A. Greenaway, Jr.
                                            JOSEPH A. GREENAWAY, JR., U.S.D.J.

---

[16] Citing Schuttler v. Reinhardt,  86 A.2d 438, 441 (N.J. Super. Ct. App. Div. 1952) ("A husband, whose wife has sustained personal injuries from the negligence of a third person, may recover from the wrongdoer for the reasonable expense incurred by him for the care, treatment and cure of the wife, *and* for the loss of consortium, that is, her services and her society, companionship and comfort.") (emphasis added).